# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 19-cv-62437-MOORE

AROUND THE CLOCK A/C
SERVICE, LLC,

      Plaintiff,

v.

ANTHONY PERERA, DOUGLAS
PERERA, SR., and AIR PROS, LLC,

      Defendants.

## DEFENDANT AIR PROS' MOTION FOR SUMMARY JUDGMENT

Defendant Air Pros, LLC ("Air Pros"), by and through undersigned counsel and pursuant to Rule 56, Fed. R. Civ. P., hereby moves for summary judgment, and in support thereof states as follows:

## I.    INTRODUCTION

Douglas Perera, Sr. and his son Anthony Perera started Air Pros in 2017 as a garage based HVAC (heating, ventilation and air conditioning) company. Since then, they have grown Air Pros out of the garage and into a successful multi-state business based upon excellent customer service and cutting-edge technology. On the contrary, Plaintiff, an HVAC business tracing its roots to 1988, has instead chosen to profit from frivolous trademark litigation based upon its scheme of, *in part*, registering a generic mark and refusing to use any designation such as a circle r or TM, instead of profiting from what used to be its core business. However, it cannot profit from this suit because it failed to comply with its statutory obligation to provide actual notice to Air Pros of its alleged marks therefore statutorily depriving Plaintiff of damages, fees, and costs.

Notwithstanding Plaintiff's statutory failure, there is no liability here because the actions (content on a webpage hidden from consumers that was online for a few weeks) were undertaken by a third party, E Force Web, LLC, without notice to Air Pros. As soon as Air Pros discovered the actions of the E Force Web, Air Pros requested the material be taken down. Even if Air Pros

could be liable, not only is "Air Around the Clock" a generic mark, there is no intent to infringe, and there is no admissible evidence of actual confusion causally connected to any alleged infringement. As an important feature of Air Pros' excellent customer service, Air Pros identifies itself prominently on its web domain, emails and text messages to consumers, on shirts worn by its service technicians, and on its vehicles.

As explained below, this Court should grant summary judgment in Air Pros' favor as there are no genuine issues of fact remaining.

## II.     NOTICE OF JOINDER

Air Pros provides notice that it joins the arguments of co-Defendant Anthony Perera and Douglas Perera Sr., in their Motions for Summary Judgment, to the extent applicable to him. *See* [ECF No. __] (Anthony Perera's Motion for Summary Judgment); [ECF No. ___] (Douglas Perera Sr.'s Motion for Summary Judgment).

## III.     UNDISPUTED MATERIAL FACTS

Air Pros refers to and incorporates its Statement of Material Facts ("SOMF") filed concurrent with this Motion pursuant to S.D. Fla. L.R. 56.1.

## IV.     STANDARD OF REVIEW

The Court may grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To discharge this burden, the movant may point out to the court that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). According to the plain language of Rule 56(e), the non-moving party "may not rely merely on allegations or denials in its own pleading," but instead must come forward with "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). *See Matsushita*, 475 U.S. at 587.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must present affirmative evidence to support its claim. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## V.     MEMORANDUM OF LAW

Plaintiff seeks to hold Air Pros liable on four counts. The first two counts are based on the Lanham Act, codified at 15 U.S.C. §§ 1051-1127. Plaintiff brings Count I for trademark infringement under 15 U.S.C. § 1114 and brings Count II for unfair competition and false designation of origin under 15 U.S.C. § 1125. The second two counts are based on related Florida law. Count III for deceptive and unfair trade practices (FDUTPA) under Fla. Stat. § 501.201, et seq. and Count IV for trademark infringement under Fla. Stat. § 495.131. The test for the Florida claims are the same as their federal counterparts. *See Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1344–45 (11th Cir. 2012); *Investacorp. Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1521 (11th Cir. 1991); *FIU Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 91 F. Supp. 3d 1265, 1288 (S.D. Fla. 2015).

Plaintiff alleges that Air Pros used the phrase "Air Around the Clock" on its website and in search engine advertising. (SAC at ¶ 25). Plaintiff contends that Air Pros somehow obscured a webpage at www.airprosusa.com so that consumers believed that such webpage actually belonged to Plaintiff. (SAC, at ¶ ¶ 25–26). As described in this motion, Plaintiff also contends that a telephone number also associated with the Air Pros' domain also confused consumers in thinking that the number belonged to Plaintiff. (*Id.*).

To prevail on its trademark infringement claim, Plaintiff must show that (1) its mark is valid (i.e., properly registered, not generic, not abandoned through non-use); (2) its mark was ***used*** in commerce ***by Air Pros'*** without Plaintiff's consent; and (3) the unauthorized ***use*** was ***likely to cause*** confusion, or to cause mistake or to deceive. *See Dieter v. B&H Industries of SW Fla.*, 880 F.2d 322, 326 (11th Cir. 1989); *Burger King, Corp. v. Mason*, 710 F.2d 1480, 1491 (11th Cir. 1983); *Flgolf, Inc. v. Volvik USA, Inc.*, No. 5:13-cv-59, 2014 U.S. Dist. LEXIS 190597, at *7 (M.D. Fla. May 6, 2014); *Fila U.S.A., Inc. v. Kim*, 884 F. Supp. 491, 494 (S.D. Fla. 1995).

This Court should grant summary judgment in Air Pros favor for the three reasons explained below. First, Air Pros did not receive actual notice pursuant to 15 U.S.C. § 1111, which

deprives Plaintiff of damages, fees, and costs. Second, Air Pros did not use Plaintiff's marks in commerce, and third assuming *arguendo*, that Plaintiff could show "use in commerce" by Air Pros, there is no evidence the alleged use actually caused any consumer confusion.

**A.    This Court Should Grant Summary Judgment in Air Pros' Favor on the issue of Damages**

**1.    No damages may be awarded in Counts I and II.**

It is undisputed that Plaintiff failed to provide actual notice to Air Pros (and to Douglas Perera, Sr. and Anthony Perera) of the alleged infringement of the mark in accordance with 15 U.S.C. § 1111, therefore they are not entitled to damages and fees and costs.

15 U.S.C. § 1111 requires a defendant to have actual notice of trademark registration in order to recover profits or damages. The plaintiff bears the burden of demonstrating that defendant was given actual notice of the registration. *New Century Mortg. Corp. v. 123 Home Loans*, No. 05-80549-Civ-Hurley/Hopkins, 2007 U.S. Dist. LEXIS 113709, at *15–16 (S.D. Fla. Aug. 8, 2007) (citing *United Services Automobile Association v. National Car Rental System, Inc.*, Case no. Civ.A.SA00CA137OG, 2001 WL 1910543 at *5 (W.D. Tex. 2001); *Derrick Manufacturing Corp. v. Southwestern Wire Cloth, Inc*, 934 F. Supp. 796, 812 (S.D. Tex. 1996)).

One way to provide notice is by receipt a pre-suit trademark infringement demand letter. *New Century Mortg. Corp.*, 2007 U.S. Dist. LEXIS 113709, at *16; *Kransco Manufacturing, Inc. v. Hayes Specialties Corp.*, 1996 U.S. App. LEXIS 2459, 37 U.S.P.Q.2d 1722, 1725 (Fed. Cir. 1996) (where the record was devoid of evidence that the defendant had received actual notice of the registration prior to receiving a cease and desist letter, the plaintiff could not recover damages and profits prior to the receipt of the letter). *Cf. Commodores Entm't Corp. v. McClary*, Nos. 19-10791, 19-12819, 2020 U.S. App. LEXIS 23129, at *11–12 (11th Cir. July 23, 2020) (pre-suit demand letter expressing violation of intellectual property rights sufficient to provide actual notice of trademark registration, satisfying statutory requirement). Another way is to use the registration symbol in association with a mark. *New Century Mortg. Corp.*, 2007 U.S. Dist. LEXIS 113709, at *16. Constructive notice is insufficient for plaintiff to meet its burden. *Id.*

However, the date at which damages begins to run does not start on the date of notice. Rather, a party is entitled to a "reasonable time after notification of infringement" to conduct an investigation and take corrective action. *Id.* at *16–17 (citing *Francis H. Leggett & Co. v. Premier Packing Co.*, 140 F. Supp. 328 (D.C. Mass. 1956) *abrogated on other grounds Fleishmann*

*Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714 (1967)). In *New Century Mortgage* the court determined that approximately 1.5 months was a reasonable amount of time for an investigation after defendant's receipt of a demand letter.

In this situation, there is no pre-suit demand letter, and there is no circle R or TM symbol on any of Plaintiff's marks. (SOMF, at ¶ 32). Plaintiff contends that Air Pros had actual knowledge based upon a newspaper article written by a journalist at the Miami Herald. (SAC, at ¶ 33). However, Plaintiff confuses the term actual knowledge and constructive knowledge. In any event, the evidence demonstrates that Air Pros does not know how the journalist picked Plaintiff as a competitor. (SOMF, at ¶ 29). In sum, Air Pros did not have actual knowledge. (*Id.* at ¶ 27–28, 30). Plaintiff made a conscious choice not to use the circle R or TM symbol with its purported marks. (*Id.* at ¶ ¶ 32).

Therefore, this Court should grant summary judgment in Air Pros' favor and find that even if Plaintiff proves infringement, Plaintiff is not entitled to damages, fees, or costs.

### 2.    No damages may be awarded in Counts III and IV

As Plaintiff is barred in the federal counts from recovery of damages, fees, and costs, so too is the bar for the state claims because the test for the Florida claims, are the same as their federal counterparts, *see Suntree Techs.*, 693 F.3d at 1344–45; *Investacorp.*, 931 F.2d at 1521, and courts "use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition." *Suntree Techs.*, 693 F.3d at 1344–45.

Notwithstanding, damages are barred in Counts III and IV for separate and independent reasons. First, Count III fails because it is based entirely on speculative and consequential damages. Specifically, Plaintiff's FDUTPA claim appears to seek damage for "lost sales" and for deprivation of customers and potential customers, and for customers who were specifically looking for Plaintiff. (SAC, at ¶ 61). Plaintiff also incorporates into Count III the allegations in paragraphs 1 through 44, in which plaintiff seeks damages of "lost income, profits, and business opportunities as well as irreparable harm to its business, reputation and goodwill." (*Id.* at ¶ 41). *See* (*Id.* at ¶ 59) (Count III incorporation paragraph); (*Id.* at ¶ 40) (seeking "goodwill").

However, FDUTPA only permits "actual damages," not consequential damages. *Flexstake, Inc. v. DBI Servs., LLC*, Civil Action No. 17-20858-Civ-Scola, 2018 U.S. Dist. LEXIS 202825, at *7 (S.D. Fla. Nov. 30, 2018). Proof of actual damages is necessary to sustain a FDUTPA claim.

*Id.* at *6–7 (citing cases). Consequential damages include lost profits, reputational harm, stigma damages, and goodwill. *Id.* at 7–8.

For example, in *Flexstake*, the plaintiff contended that the defendant violated FDUTPA by manufacturing and selling a knock-off of its product and sought "lost profits, damage to reputation and other adverse consequences." 2018 U.S. Dist. LEXIS 202825, at *6. The court explained that those were "all theories of consequential damages" and barred. *Id.* at *7.

Similarly, in *BPI* plaintiff sought damages of "competitive harm, ***diverted or lost sales***, and harm to the goodwill and reputation of BPI." *BPI Sports, LLC v. Labdoor, Inc.*, No. 15-62212-CIV-BLOOM, 2016 U.S. Dist. LEXIS 23033, at *17 (S.D. Fla. Feb. 25, 2016) (emphasis added). The plaintiff also alleged that the conduct of defendant "induced" customers to purchase other products instead of plaintiffs. *Id.* The court explained that those are consequential damages and barred. *Id.*

Plaintiff's attempt to recover "lost sales," and the loss of customers and potential customers, and the loss of customers who were specifically looking for Plaintiff, are all consequential damages—just like in *BPI* and *Flexstake*. Similarly, Plaintiff's attempt to recover "lost income, profits, and business opportunities as well as irreparable harm to its business, reputation and goodwill," are also consequential damages. Therefore, because FDUTPA requires actual damages, this Court should grant summary judgment in Air Pros' favor on all of Count III.

Second, Plaintiff's recovery of damages in Count IV also fails because Plaintiff failed to provide actual notice. Section 495.131, Fla. Stat., is similar to 15 U.S.C. § 1111 in that it also requires actual notice. It provides that the "registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such mark is intended to be used to cause confusion or mistake or to deceive." Fla. Stat. § 495.131. The statute thus requires that the defendant be aware of "such mark" and knowingly use the mark to cause confusion or mistake or deception. The actual notice requirement make sense given that, as explained above, the test for the Florida claims are the same as their federal counterparts.

It is undisputed that Plaintiff failed to provide notice. *See supra* Part IV.A.1. Therefore, this Court should grant summary judgment in Air Pros' favor and find that Plaintiff is not entitled to damages in Count IV.

**B.    Air Pros' Is Not Responsible For Any Online Marketing Using the Phrase "Air Around Clock"**

Plaintiff's claim for trademark infringement fails because Air Pros' did not "use" the phrase "Air around the clock" in commerce within meaning of the Lanham Act. Instead, the phrase "Air around the clock" was used by E Force Web, LLC for a few weeks for backend purposes which consumers did not see. Notwithstanding, Air Pros did not actively or knowingly consent to this use and when it was notified it immediately demanded removal.

The first step of both a trademark infringement action and a false designation or origin claim is to demonstrate an unauthorized 'use' of the plaintiff's mark in commerce" by the defendant. *Optimum Technologies, Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1242 (11th Cir. 2007); *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 936 (8th Cir. 2003) (noting that claims of trademark infringement and false designation of origin require "as a prerequisite to finding liability, that the defendant 'use in commerce' the protected mark or a colorable imitation thereof."); *Bird v. Parsons*, 289 F.3d 865, 877 (6th Cir. 2002) (making clear that the "key question" in a claim for false designation of origin "is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties"); *D.B.C. Corp. v. Nucita Venezolana, C.A.*, No. 18-25225-CIV-MORE, 2020 U.S. Dist. LEXIS 96376, at *13 (S.D. Fla. June 2, 2020) (plaintiff failed to state a claim for false designation of origin where defendants "have not yet begun to use the allegedly infringing unregistered marks" despite that defendants intended only intend to use them).

The term "use" in the "used in commerce" requirement of the Lanham Act means that the defendant must have engaged infringing conduct that is attributable to him or her or that he or she was otherwise responsible for the allegedly unlawful "uses." *See Optimum Technologies*, 496 F.3d at 1242 (affirming summary judgment where there was no evidence that defendant was responsible for infringing conduct); *Hebeeba's Dance of the Arts, Ltd. v. Knoblauch*, 430 F. Supp. 709, 713 (S.D. Ohio 2006) (stating: "[b]efore a person can be held liable for direct trademark infringement, they must have used a mark confusingly similarly to another person's trademark"). A plaintiff's failure to establish use of the mark in commerce by the defendant subjects a claim for trademark infringement to immediate dismissal. *See Gucci Am., Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228, 247 (S.D. N.Y. 2010) (concluding that plaintiff had not pled sufficient facts to support theory of direct infringement where "there is no indication that any of the defendants actually 'used the mark in commerce'"); *Triple-I Corp. v. Hudson Assocs. Consulting, Inc.*, 713 F. Supp. 2d 1267, 1281 (D. Kan. 2010) (entering summary judgment in favor of the defendant where

the plaintiffs "have not directed the Court to any evidence of [defendant's] use, or any of its officers and employees' use, of these marks").

In the instant case, Plaintiff contends that Air Pros used the phrase "Air Around the Clock" on its webpage (Exhibit B) to the SAC, and in search engine advertising. (SAC, at ¶ 25). However, as explained below, the purpose of the webpage attached to the complaint was only to link to a google call-only ad for a competitor keyword search-engine ad. This is because google required the business to link a page to a call only advertisement. Thus, if someone searched on their phone, they would see a result and would click on the link and the link would ask if they would like to call Air Pros. The customer would not be taken to the web page and it was hidden from consumers.

E Force Web, LLC ("E Force Web) was hired to manage Air Pros' pay per click advertising and marketing campaigns. (SOMF at, ¶ 2). Air Pros did not give any specific direction to E Force Web for the contents of the pay per click pages and did not review prior to publication. (SOMF at, ¶¶ 6–7). Call-only ads are web ads that send users of smartphones who type in specific keywords, targeted by the marketer, to a phone number when the user clicks the ad. (*Id.* at ¶ 8). Similarly, E Force Web's call only webpage for Air Pros was not designed for someone to ever actually look at because it was designed for call-only ads. (*Id.* at ¶ ¶ 16–17). If a user clicked on the call only ad, the advertisement would ask the person if they would like to make a phone call as opposed to transferring them to the webpage. (*Id.*). Google required E Force Web to verify the phone number associated with the call only ad, so the reason E Force Web created the webpage is to have the same phone number as the call only ad. (*Id.* at ¶ 10). The call only webpage's URL attached to the complaint www.airpros.com/air-around-the-clock was not created or chosen by Air Pros but was instead automatically generated by E Force Web's editor. (*Id.* at ¶ 11). E Force Web came up with the language, the "$59 Air Around the Clock AC repair deal" which was used on the webpage. (*Id.* at ¶ 14).

Within a couple to a few weeks after the webpage was created, Jason Stevens, head of marketing at Air Pros, contacted E Force Web in a panic to get E Force Web to remove the references to Air Around the Clock. (*Id.* at ¶ 18). Air Pros was upset when they saw Air Around the Clock on the web page and in the URL. (*Id.* at ¶ 19). Similarly, E Force Web did not intend to put "Air Around the Clock" in the URL, explaining, "it certainly shouldn't have happened. I felt stupid when Jason called me and was upset about it. I just fixed it." (*Id.* at ¶ 20).

In response to Mr. Stevens' request, E Force Web removed the references in the URL and in the webpage. (*Id.* at ¶ 21). From the time that the URL was put online until the time it was taken down, the webpage stayed up for a few weeks at most. (*Id.* at ¶ 22). However, the webpage was hidden from consumers and could not be accessed through the call-only ad. (*Id.* at ¶ 16).

**1.      There is no direct liability.**

Air Pros has no direct liability for the actions of E Force Web regarding the webpage and search engine advertising.

In *Optimum Technologies*, the plaintiff manufactured and sold a number of flooring and carpeting products, including a two-sided adhesive product applied in strips to the backs of rugs to secure them in place and prevent slippage known as "Lok-Lift Rig Gripper." 496 F.3d 1231. The defendant distributed a number of consumer goods, including adhesive tapes, to large home improvement retailers. In some cases, the defendant manufactured its own home improvement products and, in other cases, its products were supplied by outside manufacturers. The plaintiff and the defendant entered into a "handshake" distribution agreement for the Lok-Lift product whereby the plaintiff would manufacture and supply the Lok-Lift product to the defendant, and the defendant would then market, sell, and distribute the product to retailers.

Within a few years, the defendant decided to develop its own adhesive carpet tape product, known as "Hold-It," to replace the plaintiff's Lok-Lift product. The defendant advised its retailers that it was introducing the new product and that it would no longer be selling the plaintiff's product. When the plaintiff discovered that the defendant was selling its own competing product, the plaintiff terminated the parties' agreement. However, in the wake of the termination and the defendant's decision to replace the plaintiff's Lok-Lift product with its own Hold-It product, a certain amount of co-mingling of the products occurred on the shelves of the retailers. More specifically, the defendant's Hold-It product was sold on retail shelves with the Lock-Lift name on the shelf tag or signage sitting underneath, and the Hold-It product sat in "Lock-Lift" labeled display cases.

The Eleventh Circuit affirmed the district court's summary judgment in favor of the defendant, holding that "the evidence was not sufficient to allege a claim for trademark infringement ***directly*** against [the defendant] based on these 'uses,' because 'the alleged infringing uses were only attributable to the retailers, not to [the defendant].'" *Id.* at 1242 (emphasis in original). The court acknowledged that the plaintiff had presented evidence that some of the retail

outlets engaged in unauthorized uses of the plaintiff's mark. However, the appellate court explained that the dispute did not center on whether the mark was "used" in commerce at the level of the retail stores, but rather, the "pivotal question" was "whether these alleged unauthorized "uses" of the mark at the retail level should be attributable to defendant." *Id.* The Eleventh Circuit answered that question in the negative, concluding that "there was 'no evidence that [the defendant] was responsible' for the alleged misuse of [the plaintiff's] registered mark, that is, 'generating the Home Depot pricing stickers or shelving labels' or 'placing the allegedly infringing stickers on the shelves.'" *Id.*

In this case, as in *Optimum*, the "pivotal question" is not whether the phrase appeared on the webpage or in search engine advertising, but whether Air Pros was responsible for that appearance. *See Fare Deals, Ltd. v. World Choice Travel.com, Inc.*, 180 F. Supp. 2d 678, 684 (D. Md. 2001) ("A defendant cannot have used an infringing mark when it played no role in the act of placing the mark in commerce"). The evidence demonstrates that Air Pros was not, and because there is no evidence that Air Pros was responsible for the appearance of the phrase "Air around the clock," Air Pros did not "use" the phrase "Air around the clock" in commerce within meaning of the Lanham Act. Air Pros, therefore, cannot be held liable for trademark infringement and is entitled to summary judgment in its favor.

## 2. Plaintiff failed to allege contributory liability as to Air Pros and is now barred.

Contributory liability cannot be imposed upon Air Pros for the actions of E Force Web because Plaintiff's claim for trademark infringement against Air Pros is based entirely on the theory of direct liability. In *Optimum* the Eleventh Circuit affirmed the trial court's decision to refuse to consider claims of secondary liability. The court explained, that the "complaint makes clear" that the trademark infringement claim is based on defendant's alleged "'misuse' of the mark not the retailers' [misuse]." Further, the complaint did not allege that the defendant was "a 'knowing participant' in the separate, direct infringements" by the retailer. *Id.* at 1245. To permit the plaintiff "to now pursue a trademark infringement claim based on a contributory liability theory would require us to convert what is plainly a direct trademark infringement claim into one for contributory infringement [which] . . . is a step we are loath to take, and one for which there appears to be no authority in our circuit." *Id.* Moreover, Lanham Act cases "suggest that contributory trademark infringement is typically alleged as a separate count." *Id.* at 1245–46. *See also Procter & Gamble Co. v. Haugen*, 317 F.3d 1121, 1128–29 (10th Cir. 2003) (where the plaintiff never

used the phrase "contributory infringement," and where the plaintiff only stated that the defendant "implied[ly] approv[ed]" of the infringing acts, the court was "reluctant to adopt [such a] broad definition of notice pleading so as to include a claim for contributory infringement").

Finally, even if the plaintiff had pled a claim for contributory infringement, the court determined that there was no evidence in the record of Optimum's "knowing participation" in the alleged direct infringement, which is necessary to sustain a claim for contributory infringement. *Optimum Technologies*, 496 F.3d at 1246.

In this situation, Plaintiff did not plead a separate count against Air Pros for contributory trademark infringement. Moreover, throughout the SAC, Plaintiff contends that Air Pros directly—not through a different party—was the entity responsible for the alleged infringement. *See, e.g.*, (SAC, at ¶¶ 25–30, 35–38); (*Id.* at Count I ¶¶ 47–48) (Air Pros' adoption and use); (*Id.* at Count I ¶ 49) (Air Pros' infringing actions); (*Id.* at Count II ¶¶ 54–56) (Air Pros' use); (*Id.* at Count III ¶ 60–61) (Air Pros' conduct); (*Id.* at Count IV ¶ 63) (Air Pros' use); (*Id.* at Count IV ¶ 64–66) (Air Pros' infringing actions). Plaintiff is bound by its pleadings, and to permit anything else would be contrary to *Optimum* and result in a denial of due process as alluded to in *P&G*.

Therefore, this Court should not permit any other theory of liability as against Air Pros.

### 3. Alternatively, no secondary liability exists.

In the alternative, to the extent this Court declines to adopt the Eleventh Circuit's reasoning, there is no secondary liability because the evidence demonstrates that there was no "knowing participation." *Optimum Technologies*, 496 F.3d at 1246.

### C. There is No Evidence of Confusion

Even if Plaintiff could show that Air Pros "used" Plaintiff's marks there is no evidence that any purported use was likely to cause confusion, as is required to state a claim for trademark infringement. *See Burger King*, 710 F.2d 1480, 1491 (to prevail on a claim for trademark infringement, the plaintiff must demonstrate that the unauthorized use was likely to cause confusion, or to cause mistake or to deceive); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 265 (5th Cir. 1980) (summarily dismissing claims for false designation of origin, unfair competition and deceptive trade practices because all of these claims require the plaintiff to demonstrate that there is a likelihood of confusion between the parties' products, and plaintiff's

failure to show a likelihood of confusion required dismissal of all the claims).[1] "Likelihood of confusion" means probable confusion, not mere possible confusion. *See Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp.2d 1261, 1265 (S.D. Fla. 1999). "[R]ecovery under the Lanham Act requires, at a minimum, that confusion, mistake, or deception be 'likely,' not merely 'possible.'" *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 651 (11th Cir. 2007) (internal quotation omitted).

The Lanham Act "is not intended to prevent all unauthorized uses of a trademark." *Marksman Sec. Corp. v. P.G. Sec., Inc.*, No. 0:19-cv-62467-KMM, 2020 U.S. Dist. LEXIS 112635, at *7 (S.D. Fla. June 25, 2020), this is because, "trademark infringement protects ***only*** against mistaken ***purchasing*** decisions and not against confusion generally." *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991) (emphasis added). A plaintiff must show "a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Custom Mfg. & Eng'g.*, a508 F.3d at 651 (quoting *New Sensor Corp. v. CE Distrib. LLC*, 303 F. Supp. 2d 304, 310-11 (E.D.N.Y. 2004)).

There are seven factors when assessing likelihood of confusion: (1) type of mark; (2) similarity of mark; (3) similarity of the products the marks represent; (4) similarity of the parties' retail outlets (trade channels) and customers; (5) similarity of advertising media used; (6) the defendant's intent; and (7) actual confusion. S*ee Frehling Enterprises, Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). Analysis of the factors "entails more than the mechanistic summation of the number of factors on each side; it involves an evaluation of the 'overall balance.'" *See Custom Mfg.*, 508 F.3d at 649. A court "must consider the circumstances of each particular case, and evaluate the weight to be accorded to individual factors, in order to make its ultimate factual decision." *Jellibeans, Inc. v. Skating Clubs of Ga.*, 716 F.2d 833, 844 (11th Cir. 1983).

### 1. "Air Around the Clock" is a weak mark.

Classifying the type of trademark at issue determines the level of protection it must be accorded. *See Frehling*, 192 F.3d at 1335. The stronger the mark, the greater the scope of

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit Court of Appeals issued before the close of business on September 30, 1981.

protection accorded it, the weaker the mark, the less trademark protection it receives. *See id.* Trademarks are divided into four categories of distinctiveness in the following ascending order of strength: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary. *See id.* "The strength of a mark depends on its distinctiveness and on the extent to which third parties have used it." *Ocean Bio-Chem, Inc. v. Turner Network Tele., Inc.*, 741 F. Supp. 1546, 1554 (S.D. Fla. 1990).

In its SAC, Plaintiff contends that "[t]he phrase which comprises the literal element of the AIR AROUND THE CLOCK marks, namely, 'Air Around the Clock,' is arbitrary as applied to air conditioning services." (SAC, at ¶ 17). An arbitrary mark is a word or phrase that "bears no relationship to the product." *Frehling*, 192 F.3d at 1335. One example of an arbitrary mark frequently provided by the Eleventh Circuit is "Sun Bank" when applied to banking services. *See, e.g.*, *id.*; *Armour Grp., Inc. v. Labock*, No. 11-61991-CIV-DIMITROULEAS/S, 2012 U.S. Dist. LEXIS 200364, at *13 (S.D. Fla. Mar. 26, 2012) ("Plaintiff's symbol of a charging rhino in a circle design is purely capricious and arbitrary because its literal meaning is unrelated to bullet-resistant armor").

In contrast to the use of the term "Sun," which bears no relationship to banking, Plaintiff use of the term "Air" in "Air Around the Clock" literally invokes air conditioning services. (SAC, at ¶ 12) (alleging that Plaintiff is in the business of "air conditioning related services"). "Around the clock" is obviously intended to casually advise the public that the company is available for work 'at all hours of the day,' or '24 hours per day.' Plaintiff's advertisements display their "24 Hour Emergency Service" (SOMF, at ¶ 33), their Florida Mark Renewal specimen advertises "Same Day 24-Hour Emergency Service" (*Id.* at ¶ 24), their Federal specimen similarly advertises "24-Hour Emergency Service" (*Id.* at ¶ 35) and Plaintiff's website prominently advertises their availability as " '24 hour/7 days' service" and "24 hours a day 7 days a week." (*Id.* at ¶ 36).

Courts around the nation have found that a time attribute which denotes 24 hours or "around the clock" is merely generic. For example, in the news context: "[g]eneric marks do not merely describe a product, but are synonymous with an entire class of products (e.g. '24-Hour News' for an around-the-clock news network)." *Preferred Nutrition, Inc. v. Vanderhaeghe*, No. C10-907RAJ, 2010 U.S. Dist. LEXIS 153676, at *24 (W.D. Wash. Nov. 22, 2010). Similarly, in the fitness context: "24 Hour Fitness" is descriptive in nature in the context of a health club. *24 Hour Fitness USA, Inc. v. Tribeca Fitness, LLC*, 277 F. Supp. 2d 356, 362 (S.D.N.Y 2003).

In *24 Hour Fitness USA*, the plaintiff alleged that defendants willfully infringed 24 Hour Fitness' federally registered trademarks and service marks. *24 Hour Fitness USA*, 277 F. Supp. 2d at 359. The court explained that even though plaintiff's mark was entitled to a presumption by virtue of its registration, the court still found that the term "24 Hour Fitness" was:

> plainly descriptive in nature when employed, as here, in the health club context. Plaintiff's disclaimer in its registrations of exclusive rights to the word "fitness" other than as a component of the mark is telling - "fitness" is a word widely used in current parlance to denote gymnasia, physical training, exercise programs and similar goods and services. "24 Hour," the other component of the mark, refers to a time frame and is ubiquitous in its use in connection with businesses that have long opening hours.

*Id.* at 362–63. The court concluded, "[t]aken together, the components, in the current context, most clearly describe a physical training-related entity that is available, if not ***around the clock***, at least for substantial periods of time on a regular basis." (emphasis added). *Id.* at 363. Therefore, the mark was not inherently distinctive. *Id.*

The mark "Air Around the Clock" is therefore a simple declarative statement identifying the characteristics of the services provided by Plaintiff; to wit: 24-hour air conditioning services. The mark is not in any way "arbitrary," to the contrary, Plaintiff's mark is generic.

Even if the court finds that the mark is descriptive, descriptive marks are entitled to protection only if the marks have acquired some level of secondary meaning. *See Mango's Tropical Café, Inc. v. Mango Martini Restaurant & Lounge, Inc.*, 844 F. Supp. 2d 1246, 1252 (S.D. Fla. 2011) (noting that descriptive marks identify a characteristic or quality of a product or service, such as "color, odor, function, dimensions, or ingredients").

For plaintiff to establish secondary meaning, they must meet a "high degree of proof." *Investacorp, Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1525 (11th Cir. 1991). Absent consumer survey evidence, four factors can be considered in determining whether a particular mark has acquired a secondary meaning:

> (1) The length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the name and the plaintiff's . . . business; and (4) the extent to which the public actually identifies the name with the plaintiff's [service].

*Id.* Although "instances of consumer confusion are probative of secondary meaning," presenting a few instances is "not adequate to present a genuine issue of material fact." *Id.* at 1526.

*Investacorp* is illustrative of why the Plaintiff's marks are at best merely descriptive. At issue in that case was the mark "Investacorp," which was being used by a corporation in the business of advising their customer in corporate investment opportunities. The district court found that the mark was suggestive – one level below arbitrary. On appeal, the Eleventh Circuit reversed, holding that the terms "invest" and "corp." when combined in the term "Investacorp," "literally convey to the observer that appellant is in the business of investing in corporations" and therefore, must be considered descriptive. *See id.* at 1524. Likewise, in this case, the words "air,' "around," "the," and "clock" when combined, literally convey to the consumer that Plaintiff is in the business of providing air conditioning services 24 hours a day. Accordingly, given the mark's mere descriptive quality, Plaintiff's "Air Around the Clock" service mark is not very strong and is entitled to only a low level of trademark protection.

While Plaintiff alleges that the mark is incontestable in Count I (SAC, at ¶ 46), incontestable status alone does not render the mark strong and it is still subject to challenge on the grounds it is generic. *Dieter v. B&H Industries of SW Fla.*, 880 F.2d 322, 329 (11th Cir. 1989); *Michael Caruso & Co., Inc. v. Estefan Enterprises, Inc.*, 994 F. Supp. 1454, 1459 (S.D. Fla. 1998) (listing cases). *See Green Prods. Co. v. Black Flag Brands LLC*, No. C-10-2121 (JCS), 2010 U.S. Dist. LEXIS 109592, at *9 n.3 (N.D. Cal. Oct. 4, 2010) ("once a mark has achieved incontestable status, it cannot be challenged on descriptiveness grounds, but can be challenged on the grounds that the mark has become generic." (internal citations omitted)); *Wallach v. Longevity Network, ltd.*, No. CV 04-2404 SJO (RZx), 2006 U.S. Dist. LEXIS 103002, at *34 n.7 (C.D. Cal. Jan. 11, 2006) ("although a mark may become incontestable, the label of 'incontestability' is rather misdescriptive. An 'incontestable' registration is still subject to certain defenses or defects, set forth in 15 U.S.C. § 1115 and as above stated does not apply to a mark that is generic." (internal citations omitted)). "If the primary significance of the trademark is to describe the ***type of product*** rather than the ***producer***, the trademark [is] a generic term and [cannot be] a valid trademark." *CG Roxane LLC v. Fiji Water Co. LLC*, 569 F. Supp. 2d 1019, 1026 (N.D. Cal. 2008) (emphasis in original).

In addition, any presumption accorded an incontestable mark may be rebutted by third party use of the mark. *Michael Caruso*, 994 F. Supp. at 1459; *Mango's Tropical Café*, 844 F. Supp. 2d at 1253. *See JIPC Mgmt. v. Incredible Pizza Co.*, No. CV 08-04310 MMM (PLAx), 2008 U.S.

Dist. LEXIS 131356, at *41–42 (C.D. Cal. Aug. 26, 2008) ("In a 'crowded' field of similar marks, each member of the crowd is relatively 'weak' in its ability to prevent use by others in the crowd.").

Submitted with Air Pros's Motion for Summary Judgment are numerous third-party registrations for marks using the phrase "Around the Clock" in connection with numerous types of services, including a number of internet references to businesses around the country using "Around the Clock" for air conditioning businesses. (SOMF, at ¶ ¶ 37–39)

In sum, as explained in Air Pros' Motion, Plaintiff's mark merely conveys to the consumer that Plaintiff is in the business of providing air conditioning services 24 hours a day and does not require the consumer to use his or her imagination to understand the mark's meaning. To suggest "around the clock" or "air around the clock" is unique in any way would be impossible. When coupled with evidence of significant third-party use, Plaintiff's "Air Around the Clock" service mark is not very strong and is entitled to only a low level of trademark protection (if any).

### 2.       No Intent to Infringe.

There is also no evidence that Air Pros' intended the phrase "Air around the clock" to appear on the webpage hidden from consumers or in online advertisements which show the Air Pros' domain. Rather, the evidence demonstrates that it was due solely to independent actions undertaken by a third party, which actions were promptly corrected after Air Pros' discovery.

In *Nelson-Ricks Cheese Company*, the court discussed the implications of a webpage that was not physically linked to a website. *Nelson-Ricks Cheese Co. v. Lakeview Cheese Co., Ltd. Liab. Co.*, 331 F. Supp. 3d 1131 (D. Idaho 2018). There, plaintiff, Nelson-Ricks Cheese Company ("NRCC") filed suit against defendant Lakeview Cheese Company LLC ("Lakeview") for trademark infringement based off of the use of the mark "Nelson-Ricks Creamery Company" on the "About Us" webpage. *Id.* at 1137. At the relevant time period, NRCC became aware that even though the about webpage no longer linked to the website, "if manually typed into a web-browser, a person could still access the page" that contained the mark. *Id.* After NRCC sent Lakeview a cease and desist letter demanding that the information be changed or taken down, Lakeview altered the about webpage to remove the mark. *Id.*

In the intent factor of the confusion test, plaintiff's expert proffered testimony that "even though that webpage was not physically linked to Lakeview's . . . websites, Lakeview would still reap the benefits of any initial internet searches. *Id.* at 1142. The court explained that even taking that opinion as true, it does not speak to "whether Lakeview intended to mislead or deceive the

public . . . Although internet searchers may have found Lakeview's About Us webpage, that does not mean that Lakeview was nefariously striving to make that happen." Rather, the court found that the fact that NRCC found the webpage "is not indicative of bad behavior on Lakeview's part." *Id.* at 1142. Moreover, when Lakeview was alerted of the mark, it immediately took additional measures. *Id.*

In this situation, E Force Web, he explained that the URL was automatically generated, and that E Force Web did ***not*** consult with Defendant prior to posting the alleged infringing webpage, and that after Air Pros discovered the  URL they asked for it to be removed, and that as initially posted, the webpage "wasn't accessible on the website through navigation" and that the page was "***not something shown to customers***." (emphasis added). (SOMF, at ¶ 16).

The fact that Plaintiff attached the webpage to the SAC or that Plaintiff was somehow able to access the webpage is a red herring. This is because it does not speak to Air Pros' or E Force Web's intent.

> **3.     No Actual Confusion.**

For an alleged actual confusion event to be probative of a likelihood of confusion, there must be "a causal connection between the use of similar marks and instances of actual confusion. Evidence must be viewed in context." *ComponentOne, L.L.C. v. ComponentArt, Inc.*, No. 02: 05cv1122, 2008 U.S. Dist. LEXIS 87066, at *62 (W.D. Pa. Oct. 27, 2008) (quoting *Rockland Mortgage, Rockland Mortg. Corp. v. S'holders Funding, Inc.*, 835 F. Supp. 182, 197 (D. Del. 1993). *Accord GOLO, LLC v. Goli Nutrition Inc.*, Civil Action No. 20-667-RGA, 2020 U.S. Dist. LEXIS 158508, at *22 (D. Del. Sep. 1, 2020).

In this situation there is no evidence, such as a customer's declaration or deposition, or a survey, or an expert opinion, causally linking ***any*** alleged confusion to any alleged infringement. Notwithstanding, Air Pros addresses the alleged infringing acts in turn.

**First, there is no actual confusion from the purchase of ad words or phone linking.** Claims of trademark infringement based on the purchase of keywords pertaining to a competitor, or the competitor's trademark, have been frequently rejected. *See, e.g., Jim S. Adler, P.C. v. McNeil Consultants, LLC, No. 3:19-cv-2025-K-BN*, 2020 U.S. Dist. LEXIS 157846, at *12-13 (N.D. Tex. Aug. 10, 2020) ("The purchase of a competitor's trademark as a keyword for search-engine advertising, without more, is insufficient for a claim of trademark infringement." (citing cases)); *Earthcam, Inc. v. OxBlue Corp.*, 49 F. Supp. 3d 1210, 1240–41 (N.D. Ga. 2014) (granting

summary judgment in favor of defendant based on purchase of term "oxblue" as a search engine keyword); *see also* J. Thomas McCarthy, 5 McCarthy On Trademarks And Unfair Competition § 25A:7 (5th ed.) ("Almost all District Courts have found that no likelihood of confusion was caused by the purchase of keywords alone.").

Similarly, for online advertisements, the Ninth and Tenth Circuits have held that the last factor—the labeling and appearance of the advertisements and the surrounding context of the screen displaying the search results—is the most critical in determining whether a likelihood of confusion exists in cases where the defendant has used a competitor's mark as a keyword search term. *Id.* (citing *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1154 (9th Cir. 2011); *1-800 Contacts, Inc. v. Lens.Com, Inc.*, 722 F.3d 1229, 1245 (10th Cir. 2013)). This is why, where, the **domain name** of a website itself makes clear that it is not affiliated with trademarks, the use of the marks does not present a likelihood of confusion. *Ascentive, LLC v. Op. Corp.*, 842 F. Supp. 2d 450, 462 (E.D. N.Y. 2011).

Finally, under Lanham Act jurisprudence, "it is irrelevant whether customers would be confused as to the origin of the websites, unless there is confusion as to the origin of the respective products." *Taubman Co. v. Webfeats*, 319 F.3d 770, 776 (6th Cir. 2003) (citing *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997)).

Plaintiff contends that in addition to the website, the use of the phrase in search engine advertising is part of a scheme to redirect consumers who search online. (SAC, at ¶ ¶ 25–26) However, "[b]ecause consumers diverted on the Internet can more readily get back on track than those in actual space, thus minimizing the harm to the owner of the searched-for site from consumers becoming trapped in a competing site, Internet initial interest confusion requires a showing of intentional deception." *Ascentive, LLC v. Op. Corp.*, 842 F. Supp. 2d 450, 465 (E.D. N.Y. 2011) (quoting *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 462 n.13 (2d Cir. 2004)); *see Playboy Enters. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1034–35 (9th Cir. 2004) (Berzon, J., concurring) (noting the minimal inconvenience in directing one's web browser back to the original list of search results"); *Bihari v. Gross*, 119 F. Supp. 2d 309, 320 n.15 (S.D. N.Y. 2000) ("with one click of the mouse and a few seconds delay, a viewer can return to the search engine's results and resume searching for the original website.").

As testified by E Force Web, the page was hidden from consumers, and the advertisement always displayed the domain:

Call 954-228-9716 | $59 Tune Up Special | Get Your Air Conditioning Fix
https://www.floridaairpros.com/local-hvac-services
$59 AC Repair Services - AC Damaged & Needing Repairs?
Receive Expert Service, With Mom & Pop Care. Local Heating & Cooling Experts, Great Reviews Online, Same Day Services

(SOMF, at ¶ 23).

**Second, there is no confusion from the webpage**, attached to the complaint as Exhibit B because in addition to the domain name stating "Air Pros" the page was hidden from consumers. In similar circumstances, courts have found that if an infringing product is hidden from consumers, it cannot cause any confusion as a matter of law. *General Motors Corp. v. Keystone Automotive Industries, Inc.*, 453 F.3d 351, 359 (6th Cir. 2006) (noting that if an alleged infringing product is hidden, it "cannot cause . . . confusion as to origin or sponsorship"); *Volkswagen AG v. Dorling Kindersley Publ'g, Inc.*, 614 F. Supp. 2d 793, 800 (E.D. Mich. 2009) (concluding that the mark is "very small" and "difficult to discern with the naked eye" therefore as a matter of law "there is no possible likelihood of confusion").

Analogously, in *Southern Snow*, the plaintiff, SnoWizard, claimed that defendant Parasol infringed on SnoWizard's trademark SNOWIZARD by using the phrase "snow wizard" as a metatag on Parasol's internet website. *S. Snow Mfg. Co. v. Sno Wizard Holdings, Inc.*, No. 06-9170, 2011 U.S. Dist. LEXIS 15723, at *4 (E.D. La. Feb. 15, 2011). The metatag was hidden to consumers. The court held that the SnoWizard could not prevail on its metatag claim "without evidence of what actually takes place" as a result of the trademarked phrase "being hidden" on the defendant's Parasol's website. The court asked:

> Is every consumer diverted to Parasol's website, or is Parasol listed at the top of many search results, or somewhere in the middle of a result list, or twenty names down the list? Does the consumer have to type in just "snow wizard" or is the metatag triggered by other variations of the phrase too? Certainly the likelihood of consumer confusion will turn on questions such as these but the record contains no evidence of this nature.

*Id.* at *9.

In this situation, similar to *GM* and *Volkswagen*, the **entire webpage** was hidden from consumers in a manner that prevented a consumer from accessing the webpage. E Force Web testified that the webpage was hidden from consumers. There is no evidence that any consumer saw the webpages, similar to *Southern Snow*, Plaintiff has not proffered any evidence that ay consumer accessed the webpage, and finally, even if a consumer saw the webpage, there was a large Air Pros truck on the webpage:



**Third, there is no confusion prior to or after any purchase**. Prior to an Air Pros technician arriving at a customer's location, an Air Pros customer receives a text message confirmation of their appointment, a phone call confirming their appointment, and a text message upon dispatch of the technician. (SOMF, at ¶ ¶ 25–26). The customer also receives a confirmation that states "Thank you for choosing Air Pros. Your scheduled appointment is . . . ." (*Id.*). At the end, the customer gets an opportunity to review Air Pros and also receives a thank you email. (*Id.*). The customer is also provided with a picture of the technician in uniform, a biography of the technician, and the link to the Air Pros website and contact information. (*Id.*). Air Pros employees are equipped with orange-and-black-striped trucks and Air Pros uniform shirts. (*Id.*).

## VI.    CONCLUSION

**WHEREFORE**, AIR PROS, LLC, for all of the reasons discussed above, and in the reasons expressed in co-Defendant's Anthony Perera and Douglas Perera Sr.'s Motions for Summary Judgment, respectfully requests entry of summary judgment in its favor and against Plaintiff on all its claims, in federal and state law.

Respectfully submitted,

**LALCHANDANI SIMON PL**
25 S.E. 2nd Avenue, Suite 1020
Miami, Florida 33131
(305) 999-5291 (office)
(305) 671-9282 (fax)

By: */s/ Daniel J. Simon*
        Daniel J. Simon (FBN 16244)
        danny@lslawpl.com
        Daniel E. Davis (FBN: 104970)
        ddavis@lslawpl.com
        *Attorneys Air Pros, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2020, a true and correct copy of the foregoing document was filed with the Clerk of Court via CM/ECF, which effectuated service on all counsel of record via transmission of a Notice of Electronic Filing generated by CM/ECF.

By: */s/ Daniel J. Simon*
        Daniel J. Simon